UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CAMELART LIMITED,<br><br>    Plaintiff,<br><br>v.<br><br>STONEX GROUP INC.<br>F/K/A INTL FCSTONE FINANCIAL, INC.,<br><br>    Defendant. | No. 20-cv-7707<br><br>Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Camelart Limited ("Camelart") has filed this action against StoneX Group f/k/a INTL FCStone Financial, Inc. ("StoneX"). Camelart's complaint purports to bring two claims: unauthorized trading under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, and breach of contract under Illinois law. StoneX moved to dismiss Camelart's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, that motion is granted.

**Standard**

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-

harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

**Background**

At its core, this is a breach of contract dispute between a commodities trader and his futures commissions merchant ("FCM"). Before turning to the factual allegations in the complaint, a word or two about commodities trading is in order.

A commodities futures contract is an agreement to buy or sell a commodity at a specific price on a specific date. *See Chicago Mercantile Exch. v. S.E.C.*, 883 F.2d 537, 542 (7th Cir. 1989). Each party to the contract "basically makes a bet about the future price of [the] commodity." *Ironbeam, Inc. v. Papadopoulos*, 432 F. Supp. 3d 769, 773 (N.D. Ill. 2020). So, for example, if a trader enters into a contract to purchase a commodity at a certain price three months into the future, he can sell that contract at a profit if the price of the commodity increases prior to the sale. *See Marchese v.*

2

*Shearson Hayden Stone, Inc.*, 644 F. Supp. 1381, 1382 (C.D. Cal. 1986). But the opposite can also happen—*i.e.* the price of the commodity can drop, causing the trader to incur financial losses. Indeed, commodities trading involves "highly leveraged and rapidly fluctuating markets" that are often difficult to predict. *Papadopoulos,* 432 F. Supp. 3d at 773.

Commodity traders work closely with FCMs. An FCM solicits or accepts orders to buy or sell futures contracts. *See* 7 U.S.C. § 1(a)(20)(a). Put differently, FCMs are like "stockbroker[s] for derivatives." *ADM Inv. Servs., Inc. v. Collins*, 515 F.3d 753, 754 (7th Cir. 2008). Traders place their orders through FCMs, who in turn execute the trades on their clients' behalf with a futures clearinghouse. *See Papadopoulos*, 432 F. Supp. 3d at 773 (citing *Collins*, 515 F.3d at 756). The clearinghouse validates and finalizes the transaction, ensuring that both the buyer and the seller honor their contractual obligations. *Id.* at 774. Importantly, FCMs are responsible to the clearinghouse for the trades. *Id.* at 774. If a trader suffers losses that it cannot pay, the FCM must pay the clearinghouse from its own funds. *Id.*

Due to the risky nature of commodities trading and the fact that FCMs can be on the hook for their clients' losses, FCMs require clients to deposit margin. Margin is essentially a "performance [bond] designed to ensure that traders can meet their financial obligations." *Id.* (citation omitted). It helps protect FCMs from "holding the bag when the traders suffer losses." *Id.* (citation omitted). The amount of margin deposited is usually "only . . . a fraction of the actual cost on a trade." *Id.* But if a trade turns south and the value of the client's positions fall below a certain amount,

3

the FCM can issue a "margin call," which is a demand that the client deposit additional money into its account. An FCM may issue margin calls several times in a single week depending on the volatility of the market and the client's positions. To protect themselves, FCMs traditionally enter into agreements with their clients "that impose margin requirements and entitle [FCMs] to liquidate the customers' positions when necessary." *Id.*

Against this backdrop, StoneX is the FCM through which Camelart traded commodities. Camelart's principal investor and owner is Andrii Verevskyi, who directed Camelart's futures trading account from Europe. StoneX is based in the United States. Although Europe and the United States are separated by several time zones, Verevskyi communicated with his primary contact at StoneX, Matthew Ammermann, almost every day. The two regularly discussed Camelart's trading positions, and Ammermann would buy and sell futures contracts in Camelart's account at Verevskyi's direction. Camelart and StoneX memorialized their relationship in a Futures & Exchanges-Traded Options Customer Agreement drafted by StoneX (hereinafter, "the Agreement").

Camelart first opened its account with StoneX in May 2017.[1] On several occasions over the following three years, StoneX issued margin calls requiring Camelart to deposit additional funds into the account. Because Verevskyi is based in

---

[1] Camelart's complaint uses the terms "margin account," "trading account," "futures trading account," and "oil trading account" interchangeably to describe the account in question. *See* R. 1 ¶¶ 1, 6-7, 15, 23, 51; *see also* R. 15 at 3-4. For the sake of consistency, the Court will refer to the account as "Camelart's account" or "the account".

4

Europe, Camelart satisfied the calls by wiring funds from a European-based bank. And because the time difference between Europe and the United States is several hours, Ammermann provided Camelart a reasonable amount of time to transfer the funds. The parties rarely had a problem satisfying margin calls over the course of their relationship—that is, until March 2020.

According to Camelart, two events in March 2020 brought significant volatility to the oil markets in particular. First, the emergence of the coronavirus caused a great deal of concern about the health of the global economy and naturally left many investors feeling uncertain. Second, Saudi Arabia and Russia—two oil-rich nations—found themselves in a bitter, public dispute over the amount of oil that should be produced and sold. This dispute, coupled with the pandemic, caused Camelart's oil-specific positions to fluctuate in value, which in turn affected the amount of margin that Camelart was required to maintain in its account with StoneX.

Between March 11 and March 13, Camelart satisfied a margin call by wiring about $4 million to StoneX. On March 17, Ammermann and Verevskyi discussed the call, and Verevskyi asked Ammermann if additional funds were needed. Ammermann told Verevskyi that he did not know, but recommended that they wait to see what Camelart's account looked like at the end of the trading day. On March 18, Verevskyi and Ammermann talked several times about potential moves in the futures markets. During these conversations, Ammermann made no mention of a margin call nor did he state that Camelart's account was at risk of being liquidated. Nevertheless, StoneX made a late-in-the-day margin call for about $3 million. StoneX did not give Verevskyi

5

a deadline by which Camelart was required to wire the funds, but due to the timing of the call, Camelart's bank in Europe had already closed and there was no other way for Camelart to wire the funds to StoneX by the end of the day. Verevskyi assured Ammermann that StoneX would have the requisite funds when Camelart's bank re-opened on March 19, and he instructed Ammermann not to liquidate or close Camelart's account or positions in the meantime. StoneX received the funds from Camelart's European-based bank on March 19 but by then it was too late. StoneX had already liquidated positions in Camelart's account and closed the account despite Verevskyi's instructions otherwise. Camelart alleges that StoneX's actions caused Camelart to lose several millions of dollars in profits because it was not able to take advantage of favorable market conditions in the days that immediately followed the margin call.

Camelart brings two claims. First, Camelart alleges that StoneX breached the Agreement by failing to provide Camelart "a reasonable amount of time" to satisfy the March 18 margin call and by not following Verevskyi's instructions to keep the account open. Second, Camelart alleges that StoneX violated the Commodity Exchange Act by liquidating and closing the account without Verevskyi's consent. The Court considers each claim in turn.

## Analysis

### I. Breach of Contract Claim

To state a breach of contract claim under Illinois law, Camelart must plausibly allege: "(1) the existence of a valid and enforceable contract; (2) substantial

6

performance by [Camelart]; (3) a breach by [StoneX]; and (4) resultant damages."[2] *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. 2004)). At issue here are the third and fourth elements—that is, StoneX argues that Camelart has failed to plausibly allege a breach of the Agreement or resulting damages. The Court addresses the breach argument first.

In construing contracts under Illinois law, "the primary objective is to give effect to the intention of the parties." *Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*, 870 F.3d 682, 689-90 (7th Cir. 2017) (citing *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007)). "A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Gallagher*, 874 N.E. 2d at 58 (citation omitted). A contract should be construed as a whole, viewing each provision in light of the other provisions. *Id.* (citation omitted). "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004) (citation omitted). However, if the language in the contract is susceptible to more than one meaning, it is ambiguous and the court can consider extrinsic evidence to determine the parties' intent. *Gallagher*, 874 N.E.2d at 58 (citation omitted).

---

[2] Illinois law governs the breach of contract claim, as the Agreement's choice-of-law provision states that disputes are "governed by the Laws of the State of Illinois." *See* R. 1-1 at 22. The parties do not disagree.

The plausibility of Camelart's allegation that StoneX breached the Agreement turns on the interplay of four key provisions. The first, known as the Margin Requirement Provision, required Camelart, as StoneX's customer, to maintain adequate funds in its account subject to StoneX's discretion. That provision states:

> Customer agrees at all times to maintain such margin in Customer's account and sub-account(s) as FCM may from time to time in its sole discretion require.

R. 1-1 at 15 § 4.[3] The second provision, the Reasonable Period Provision, obligated StoneX to notify Camelart of margin calls and allow Camelart a "reasonable period" to satisfy such calls when practicable, stating:

> FCM shall, to the extent practicable under the circumstances, notify Customer of margin calls or deficiencies to allow a reasonable period for Customer to provide funds.

*Id.* The third provision, referred to as the Notwithstanding Provision, provided StoneX with the authority to liquidate Camelart's positions without prior notice if the account became undermargined at any time.

> Notwithstanding anything in this Agreement to the contrary, if any of Customer's accounts are undermargined, have zero equity or are equity deficit [sic] at any time, or in the event FCM is unable to contact Customer due to Customer's unavailability or due to a breakdown in electronic communications, FCM shall have the right in its sole

---

[3] Camelart attached a copy of the Agreement to its complaint. Accordingly, the Court may consider the Agreement when ruling on this Rule 12(b)(6) motion to dismiss. *See Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 n.2 (7th Cir. 2017) ("When ruling on a motion to dismiss, the court may consider documents . . . attached to the complaint, documents . . . central to the complaint and . . . referred to in it, and information that is properly subject to judicial notice.") (citation and quotation marks omitted).

8

discretion, to liquidate all or any part of Customer's positions through any means available, without prior notice to the Customer.

*Id.* Finally, the Necessary Provision authorized StoneX to liquidate and close out Camelart's account without prior notice if the account had insufficient margin, if StoneX "deem[ed] itself insecure," or if StoneX considered liquidation "necessary for [its own] protection."

> In the event . . . Customer fails to deposit or maintain required margin . . . [or] FCM, for any reason whatsoever, deems itself insecure or if necessary for FCM's protection . . . then FCM is hereby authorized, in its sole discretion, to [] sell any or all of the Commodity Interests or other property of Customer which may be in FCM's possession, or which FCM may be carrying for Customer . . . in order to close out the account . . . in whole or in part. . . . Such sale . . . may be made according to FCM's sole discretion . . . without notice to Customer. . . . [These] actions may be taken without demand for margin or additional margin, without prior notice of sale or purchase or other notice or advertisement to Customer.

*Id*. at 19-20 § 18.

Piecing these provisions together, StoneX argues that Camelart's breach of contract claim fails because the Agreement explicitly allowed StoneX to liquidate the account without Camelart's authorization, against its wishes, and without any prior notice if Camelart failed to maintain margin or deposit margin within the time specified by StoneX. R. 13 at 6-7; R. 19 at 2-4. StoneX further argues that even though it made a margin call on March 18 pursuant to the Reasonable Period Provision, the other provisions in the Agreement did not require StoneX to wait a reasonable amount of time before liquidating positions in the account. R. 19 at 2-4.

In response, Camelart concedes that its account was undermargined on March 18 but contends that the Reasonable Period Provision and Notwithstanding Provision

9

presented StoneX with a choice: either (a) issue a margin call under the Reasonable Period Provision and give Camelart a reasonable amount of time to wire the necessary funds, or (b) liquidate Camelart's positions under the Notwithstanding Provision without any prior notice. R. 15 at 7-9. According to Camelart, if StoneX chose the first option and issued a margin call, then StoneX had to live with that decision and could not later liquidate Camelart's positions under the Notwithstanding Provision without first allowing Camelart a reasonable opportunity to satisfy the call. *Id*.

Camelart's interpretation of the Agreement is inconsistent with its plain language. As discussed, the Notwithstanding Provision states that StoneX "shall have the right in its sole discretion, to liquidate all or any part of [Camelart's] positions," "without prior notice to [Camelart]," if "any of [Camelart's] accounts are undermargined." *See* R. 1-1 at 15 § 4. Nothing about that language renders StoneX's right to liquidate contingent on the Reasonable Period Provision. Nor does the language suggest that StoneX was required to make an "either/or" choice between issuing a margin call and waiting a reasonable amount of time for the funds, or liquidating Camelart's positions without prior notice. The language is absolute—StoneX "shall" have the right, in its "sole discretion," to liquidate "all or any" part of Camelart's positions "without prior notice" if Camelart's account becomes undermargined at "any time". And importantly, the Notwithstanding Provision—which appears in the Agreement immediately after the Reasonable Period Provision—begins with the (unsurprising) phrase, "*notwithstanding* anything in this

10

Agreement to the contrary." *Id.* (emphasis added). The word "notwithstanding" means "in spite of." *Soarus LLC v. Bolson Materials Int'l Corp.*, 905 F.3d 1009, 1012 (7th Cir. 2018) (interpreting Illinois law). It "implies the presence of an obstacle" and "in essence wipes out anything to the contrary." *Id.* (citing *Bd. of Educ. of Maine Tp. High School Dist. No. 207 v. Int'l Ins. Co.*, 799 N.E. 2d 817, 824 (Ill. App. Ct. 2003); *Cent. Ill. Pub. Serv. Co. v. Allianz Underwriters Ins. Co.,* 608 N.E. 2d 155, 157 (Ill. App. Ct. 1992)). As such, the phrase "notwithstanding anything in this Agreement to the contrary" makes clear that the right conferred on StoneX to liquidate Camelart's undermargined account is not confined by any competing provision in the Agreement, including the Reasonable Period Provision, which immediately precedes it. *See Bd. Of Educ. Of Main Twp. High Sch. Dist. No. 207*, 799 N.E.2d at 824 (reaching similar conclusion based on a contract's use of the phrase "[n]otwithstanding anything contained herein to the contrary"). Simply put, the Reasonable Period Provision did not contractually require StoneX to wait a reasonable period of time before liquidation.

This reading of the Agreement comports with the "basic contract principle that the meaning of separate contract provisions should be considered in light of one another and the context of the entire agreement." *Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 745 (7th Cir. 1996). To understand why, it is helpful to see the Margin Requirement Provision, the Reasonable Period Provision, and the Notwithstanding Provision as they appear side-by-side in the Agreement.[4]

---

[4] To improve readability, each provision is highlighted in a different color.

**4. Margin.** Customer agrees at all times to maintain such margin in Customer's account and sub-account(s) as FCM may from time to time in its sole discretion require. FCM shall, to the extent practicable under the circumstances, notify Customer of margin calls or deficiencies to allow a reasonable period for Customer to provide funds. Notwithstanding anything in this Agreement to the contrary, if any of Customer's accounts are under-margined, have zero equity or are equity deficit [sic] at any time, or in the event FCM is unable to contact Customer due to Customer's unavailability or due to a breakdown in electronic communications, FCM shall have the right in its sole discretion, to liquidate all or any part of Customer's positions through any means available, without prior notice to the Customer.

Taken together, these provisions mean that: (1) StoneX may require Camelart to maintain margin; (2) when it is practicable, StoneX shall issue a margin call to allow a reasonable period for Camelart to wire funds; (3) but notwithstanding that call, StoneX still maintains the right to liquidate Camelart's positions without prior notice if the account lacks sufficient margin at any time. Put differently, StoneX must issue a margin call if the circumstances are practicable, but even when it does issue that call, StoneX is not contractually obligated to wait a reasonable amount of time for Camelart to wire the funds. The Notwithstanding Provision authorizes StoneX to skip the waiting game and head straight to liquidation. Otherwise, the words "notwithstanding anything in this Agreement to the contrary," which immediately precede the language describing StoneX's right to liquidate, would be meaningless. *See Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011) ("A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used.").

This conclusion is bolstered by the fact that the Agreement also contains the Necessary Provision, which gives StoneX broad, unfettered discretion to "close out" a

12

customer's account without prior notice if the account has insufficient margin, if StoneX "deems itself insecure," or if StoneX considers liquidation "necessary for [its own] protection." It cannot be the case that once a margin call is made, StoneX loses this authority until Camelart satisfies the call or a reasonable amount of time has passed. That is especially so given the fact that StoneX, as an FCM in the futures trading industry, is exposed to a significant amount of risk. As explained earlier, futures markets can experience enormous volatility in a matter of minutes or hours, and if a customer like Camelart suffers financial losses that it cannot cover, StoneX must pay the clearinghouse from its own funds. *See ADM Investor Services*, 515 F.3d at 756. ("The futures commission merchant then is on the hook, for it is a condition of participation in these markets that each dealer guarantee customers' trades."). The Necessary and Notwithstanding Provisions essentially protect StoneX against this risk. *See Collins*, 515 F.3d at 756 ("[M]argin requirements in futures markets are not designed to protect investors . . . from adverse price movements. Margin protects counterparties from investors who may be unwilling or unable to keep their promises.").

Nevertheless, Camelart likens this case to *Nanlawala v. Jack Carl Associates, Inc.*, 669 F. Supp. 204 (N.D. Ill. 1987). There, plaintiffs argued that an FCM breached their customer agreement by not providing a reasonable amount of time to meet a margin call. The FCM argued in response, like StoneX does here, that the agreement provided complete discretion to liquidate plaintiffs' account. The court denied the cross-motions for summary judgment, holding that whether the FCM provided

plaintiffs a reasonable amount of time to satisfy the margin call was a genuine issue of material fact. *Id.* at 209.

*Nanlawala* is not persuasive, because unlike the Agreement here, there is no indication that the customer agreement at issue there included a notwithstanding provision. And as stated before, Illinois courts have found that in certain situations, notwithstanding provisions "wipe out any [provisions] to the contrary." *Bd. of Educ. of Maine Twp. High Sch. Dist. No. 207*, 799 N.E.2d at 824. Furthermore, *Nanlawala* is in tension with Illinois case law giving FCMs wide latitude to liquidate customer accounts when financial markets fall. *See, e.g.*, *First Am. Discount Corp. v. Jacobs*, 756 N.E.2d 273 (Ill. App. Ct. 2001). Indeed, the FCM in *Jacobs* liquidated its customers' account following a continuous slide in the S&P 500. The customers brought claims against the FCM for breach of fiduciary duty and unauthorized trading. The trial court sided with the customers, but the Illinois Appellate Court reversed, finding enforceable the provision in the parties' agreement that allowed the FCM to liquidate without any notice at all, 756 N.E.2d at 284, and further holding that FCMs—as a matter of law—are not required to provide notice before liquidating a customer's account. *Id.* at 281 (explaining how other cases "enunciate the principle that under the federal regulatory scheme, a broker is permitted to liquidate an undermargined account without prior notice"). Camelart correctly notes that the question presented in *Jacobs*—*i.e.* whether notice is required prior to liquidation—is somewhat different than the one at issue here—*i.e.* once notice is provided, whether StoneX is contractually obligated to wait a reasonable amount of time for Camelart

14

to wire the funds. But the Court has already explained why the answer to the latter question does not favor Camelart. And in any event, the Court still finds *Nanlawala*, on which Camelart relies, in tension with the broad authority *Jacobs* affords to FCMs like StoneX.

Finally, Camelart argues that its reading of the Agreement is supported by the parties' course of conduct during the three years preceding the March 18 incident. Camelart specifically points to allegations that Ammermann always communicated with Verevskyi about the need for additional funds; StoneX always allowed a reasonable amount of time for the funds to be wired; and Camelart always provided the funds within the time permitted. *See* R. 1 ¶¶ 33-37, 39-41. That course of conduct, Camelart argues, is "clear interpretive evidence" of the parties' intent as expressed in the Agreement, and provides a basis for modification of the Agreement to the extent one is necessary.

The problem for Camelart is that courts usually consider a parties' course of conduct only when the underlying contract is ambiguous, *see, e.g.*, *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984), and the Agreement here is not ambiguous for the reasons explained above. The Court therefore declines to consider the parties' course of conduct in interpreting the Agreement, and finds that Camelart has not plausibly alleged that StoneX breached the Agreement. Camelart's breach of contract claim accordingly fails.[5]

---

[5] Because Camelart has failed to plausibly allege that StoneX breached the Agreement, the Court need not reach the question of whether Camelart has plausibly alleged resulting damages.

## II. Commodity Exchange Act Claim

Camelart also brings a claim under the Commodity Exchange Act ("CEA"), alleging that StoneX violated 7 U.S.C. § 6b(a)(1)(A), which prohibits any person conducting a futures transaction on another person's behalf from "cheat[ing] or defraud[ing] or attempt[ing] to cheat or defraud the other person." This prohibition extends to "unauthorized trading," which in this context is the "knowing and deliberate execution of unauthorized trades, even if not done out of an evil motive or intent to injure the customer." *Cange v. Stotler & Co.*, 826 F.2d 581, 589 (7th Cir. 1987); *see also Prestwick Cap. Mgmt. Ltd. v. Peregrine Fin. Grp., Inc.*, 2010 WL 4684038, at *3 (N.D. Ill. Nov. 12, 2010) (claims brought under Section 6b(a)(1)(A) "do not necessarily involve misrepresentation . . . [the section] can be violated simply by virtue of a defendant's knowing unauthorized trading").

To the extent Camelart is seeking to hold StoneX liable under Section 6b(a)(1)(A) for "cheat[ing] or defraud[ing]" others, that argument fails because no allegations in the complaint concern misrepresentations, omissions, or fraud in general. Moreover, the Seventh Circuit has stated that "implementing margin rules by selling collateral is not fraud." *Mut. Assignment & Indemnification Co. v. Lind-Waldock & Co., LLC*, 364 F.3d 858, 861 (7th Cir. 2004) (discussing Section 6b(a)(1)(A) in the context of subject-matter jurisdiction).

As to unauthorized trading, Camelart alleges that StoneX acted contrary to Verevskyi's instructions by liquidating and closing the account on March 18 even though Verevskyi told Ammermann that funds would be available the next day and

that the account should remain open in the meantime. Camelart further claims that the liquidation was contrary to the parties' prior course of conduct—that is, and as mentioned before, because Ammermann always communicated with Verevskyi about the need for additional funds, StoneX always allowed a reasonable amount of time for the funds to be wired, and Camelart always provided the funds within the time permitted.

Even assuming these allegations are true, as the Court must at this stage in the proceedings, the claim still fails because StoneX was expressly authorized to liquidate Camelart's positions "any time" the account became undermargined. This right to liquidate did not somehow become nullified once Verevskyi asked Ammermann to keep the account open. Verevskyi was the customer whose account had become undermargined, and the Commodity Futures Trading Commission ("CFTC") has held in an administrative decision that "[n]othing in the [CEA] or regulations require a futures commission merchant to obtain the consent of a customer to liquidate positions on an undermargined account." *Mohammed v. Jack Carl/312 Futures, Index Futures Grp., Inc.*, 1992 WL 15686, at *3 (Jan. 27, 1992).[6] If

---

[6] Camelart's complaint alleges that StoneX's actions also violated CFTC regulations. R. 1 ¶ 68. The complaint does not mention a specific regulation, but Camelart's opposition brief references 17 C.F.R. § 166.2 in a footnote. *See* R. 15 at 15 n.3. That regulation prohibits FCMs from "directly or indirectly effect[ing] a transaction in a commodity interest for the account of any customer unless before the transaction the customer . . . specifically authorized the [FCM] to effect the transaction." 17 C.F.R. § 166.2(a). To the extent Camelart argues StoneX violated § 166.2(a), that argument is rejected for the same reasons Camelart has failed to state a claim under the CEA— that is, the Agreement expressly authorized StoneX to liquidate positions in Camelart's undermargined account without prior notice, and the CFTC has held that

17

the CEA did not require StoneX to receive Verevskyi's consent prior to liquidation, then it is difficult to see how the CEA would otherwise require StoneX to follow Verevskyi's instruction to keep the undermargined account open.

Nor is it relevant here that StoneX allegedly decided not to follow the parties' previous course of conduct. As explained earlier, the Reasonable Period, Notwithstanding, and Necessary Provisions of the Agreement are unambiguous, so what StoneX has or has not done in the past need not be considered. *See Premium Allied Tool, Inc.*, 2009 WL 395476, at *3 ("[I]n light of the unambiguous language in the contract . . . the parties' course of conduct is irrelevant.").

Camelart's relies on *Baghdady v. Robbins Futures, Inc.* for the propositions that liability "for unauthorized trading does not require a showing of fraudulent intent" and "brokers can become liable for unauthorized trading . . . merely by executing trades without the customer's permission." 1999 WL 162789, *4-5 (N.D. Ill. March 12, 1999). These statements may be correct as a matter of law, but Camelart's reliance on *Baghdady* is otherwise misplaced. The plaintiff in that case brought a claim for unauthorized trading after the defendants liquidated his account. The defendants argued that the customer agreement authorized them to liquidate the account since the plaintiff failed to meet a margin call. The court denied summary judgment, finding that there was a genuine issue of material fact as to whether the defendants "acted reasonably under the circumstances." *Id.* at *5. But in so holding,

---

"[n]othing in the CEA or *regulations*" require FCMs to obtain a customer's consent prior to liquidation.

the court relied in part on allegations that the defendants made a fraudulent misrepresentation concerning the account. *Id*. Indeed, the court noted that "while the Commodity Futures Trading Commission has universally held that good faith liquidation of an undermargined account does not amount to fraud, there still exists a question of material fact as to whether the account was liquidated in good faith." *Id*. Here, there are no allegations that StoneX lacked good faith when it liquidated Camelart's account. In fact, Camelart's own complaint acknowledges that StoneX liquidated the account during a period of "terrific volatility in the oil markets, with the price of options fluctuating significantly throughout the trading day." R. 1 ¶ 12. So *Baghdady* is inapposite.

* * *

At bottom, Camelart has failed to plausibly allege that StoneX violated the CEA and its regulations by engaging in unauthorized trading. Camelart has also failed to plausibly allege that StoneX breached the Agreement. The terms of the Agreement readily provide StoneX with the right to liquidate "all or any" parts of Camelart's account "without prior notice" if the account becomes undermargined at "any time". And, this right is provided "notwithstanding anything in [the] Agreement to the contrary." StoneX's motion to dismiss is granted.

## Conclusion

For all these reasons, the Court grants StoneX's motion to dismiss. R. 12. Camelart may move for leave to file an amended complaint if it believes it can cure the deficiencies described in this opinion. That motion must be filed within 21 days

of this order or dismissal will be with prejudice. Should Camelart file a motion for leave, it must be accompanied by a brief of five pages or less explaining why the amended complaint cures the deficiencies mentioned herein.

ENTERED:

*Thomas M Durkin*

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: June 7, 2021