UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CAMELART LIMITED,

    Plaintiff,

    v.

STONEX GROUP INC.
F/K/A INTL FCSTONE FINANCIAL, INC.,

    Defendant.

No. 20 cv 7707

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

This action by plaintiff Camelart Limited against defendant StoneX Group Inc. f/k/a INTL FCStone Financial, Inc. arises out of StoneX's liquidation of Camelart's commodities futures trading account in March 2020. After dismissing the original complaint, R. 23, the Court granted Camelart leave to amend, and Camelart filed the first amended complaint ("FAC") on July 1, 2021, R. 26. In addition to existing claims for unauthorized trading under the Commodity Exchange Act ("CEA") and breach of contract under Illinois law, the FAC adds new claims for state-law waiver, estoppel, and promissory estoppel. StoneX's has now moved to dismiss the FAC pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, StoneX's motion is granted.

**Background**

The facts underlying this matter—including a basic explanation of commodities futures trading—were set out in detail in the Court's previous order. R. 23. Between May 2017 and March 2020, Camelart had a contract with StoneX to

maintain an account for the purpose of engaging in commodities futures trading. R. 26 ¶ 24; R. 26-1. Several times prior to March 2020, Matthew Ammermann, Camelart's primary contact at StoneX, issued "margin calls" requiring Camelart to deposit additional funds into its account to cover its positions. Ammermann typically sent these margin calls directly to Camelart's owner and principal investor, Andrii Verevskyi, via email or text message. Verevskyi, who is based in Europe with a 7-hour time difference from Ammermann, would satisfy these calls by wiring funds to StoneX from a European bank. Camelart alleges that prior to March 2020, StoneX "repeatedly permitted Camelart a reasonable period to satisfy a margin call, which established how [StoneX] would conduct business with Camelart, despite any terms in the Agreement to the contrary." R. 26 ¶ 41. According to Camelart, through this "years' long course of conduct with Camelart, [StoneX] agreed that it would always allow Camelart a reasonable period to satisfy a margin call notwithstanding whatever language may have been set forth in the boilerplate contract provided to Verevskyi about [StoneX's] ability to liquidate Camelart's trading positions." R. 26 ¶ 44. Camelart says that it relied on this "agreement" when it declined to hold funds in the United States where they could be immediately transferred during the U.S. business day if necessary.

In March 2020, the confluence of the COVID-19 pandemic and an oil pricing dispute between Saudi Arabia and Russia created significant upheaval in the global oil market. Fluctuations in commodity prices affected the value of Camelart's oil-specific positions, which in turn affected the amount of margin (i.e., money) that

Camelart was required to maintain in its account with StoneX. Camelart alleges that during this period of "market turmoil," Ammermann "assured Camelart that its trading positions would not be closed if amounts arising out of margin calls were sent in a reasonable time from Camelart's European bank." R. 26 ¶ 42.

Between March 11 and March 13, Camelart satisfied a margin call of approximately $4 million. Ammermann acknowledged this transfer on March 17, and Verevskyi asked what additional funds were necessary to ensure sufficient margin. Ammermann recommended they wait to see how the account closed that day, telling Verevskyi, "at this point, best to see where we close and what the result is … don[']t want to guess right now and then have a different number show." R. 26 ¶ 49. Sometime late in the day on March 18, after exchanging messages with Verevskyi about trading orders throughout the day, Ammermann made a roughly $3 million margin call on Camelart. Because Camelart's European bank had already closed, Camelart was unable to immediately satisfy this margin call. Verevskyi told Ammermann that StoneX would receive the requested funds when European banks reopened on March 19 and instructed Ammermann not to close Camelart's account or liquidate its positions in the meantime. R. 26 ¶¶ 53-54. The FAC does not say whether Ammermann responded to these messages, but by the time Camelart wired the requested funds to StoneX on March 19, StoneX had already closed Camelart's oil trading account and liquidated its position.

The FAC maintains Camelart's existing claims for violation of the CEA and breach of contract and adds three new state law claims: (1) waiver; (2) estoppel; and (3) promissory estoppel. R. 26 ¶¶ 91-104.

## Legal Standard

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

**Analysis**

## I. Breach of Contract Claim

Camelart maintains that it has stated a plausible claim for breach of contract, but candidly raises no new arguments in support of that claim. R. 31 at 14. Rather, it incorporates and restates the arguments from its opposition to StoneX's first motion to dismiss in order to preserve them for appeal. R. 31 at 14. The Court therefore dismisses the breach of contract claim for the same reasons stated in its prior opinion. R. 23.

## II. Commodity Exchange Act Claim

To state a claim for fraud under the CEA, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019) (quoting *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008)); *see also Lindstrom v. TD Ameritrade, Inc.*, No. 20 C 4028, 2020 WL 7398792, at *3 (N.D. Ill. Dec. 17, 2020) (applying these elements to a fraud claim under the CEA). Fraud claims must be pled with particularity. Fed. R. Civ. P. 9(b); *Cornielsen*, 916 F.3d at 598. "This generally means describing the who, what, when, where, and how of the fraud." *Cornielsen*, 916 F.3d at 598. (cleaned up).

The Court previously dismissed Camelart's CEA claim because Camelart made no allegations concerning "misrepresentations, omissions, or fraud in general" and because the unambiguous contract gave StoneX express authority to liquidate

Camelart's position "any time" the account became under-margined. R. 23 at 16-17. In the FAC, Camelart has attempted to bolster its CEA claim with allegations that StoneX made "material misrepresentations" regarding how it would handle margin calls.[1] Camelart's central argument is that StoneX misrepresented that it "would ***always*** allow Camelart a reasonable period in which to satisfy margin calls." R. 31, at 11 (emphasis added). In this way, StoneX allegedly defrauded Camelart when it "retracted its prior positions and representations" and abruptly liquidated Camelart's positions before Camelart could satisfy the March 18 margin call. R. 26 ¶ 73. To this effect, Camelart has added several new allegations in the FAC, such as:

- that StoneX's "conduct and statements communicated to Camelart that Camelart would always be given a reasonable time to wire funds from Camelart's European banks in response to margin calls," R. 26 ¶ 45;

- that StoneX, "through Ammermann, made materials misrepresentations to Camelart that it would not liquidate Camelart's account following a margin call without allowing a reasonable period for Camelart to satisfy the margin call," R. 26 ¶ 71;

- that StoneX "represented to Camelart on several occasions through its conduct and words that [StoneX] would not liquidate Camelart's trading

---

[1] The FAC does not add any new allegations to support a theory of unauthorized trading, which remains foreclosed for the reasons stated in the Court's prior opinion. R. 23 at 16-19.

    positions without first giving Camelart a reasonable period of time to wire funds from Camelart's European bank accounts," R. 26 ¶ 94; and

- that StoneX "made an unambiguous promise to Camelart that [StoneX] would give Camelart a reasonable period of time to wire funds from Camelart's European banks in response to margin calls," R. 26 ¶ 101.

Camelart alleges that StoneX provided similar assurances that Camelart's trading positions "would not be closed if amounts arising out of margin calls were sent in a reasonable time from Camelart's European bank" multiple times up to and including the turbulent period in March 2020. R. 26 ¶ 42. Camelart reiterates that it relied on these assurances by declining to keep funds available in a U.S. bank for immediate transfer during European non-business hours.

Despite these new allegations, it remains questionable whether Camelart has plausibly alleged a misrepresentation at all. Its allegations are largely conclusory, stating how Camelart interpreted whatever StoneX said or did, rather than StoneX's actual words or actions. The only specific statement from Ammermann that Camelart has identified came on March 17, when Verevskyi asked whether additional funds were necessary and Ammermann responded, "at this point, best to see where we close and what the result is … don't want to guess right now and then have a different number show." R. 26 ¶ 49. Camelart does not explain how this statement is misleading or constitutes a promise not to liquidate Camelart's account if it became under-margined (which, again, was an ever-present possibility under the contract). Furthermore, even if StoneX said at certain times that it would not close Camelart's

account if a margin call was met in a reasonable time, that is perfectly consistent with StoneX's discretionary rights under the contract. Such a statement is distinct from an explicit promise by StoneX that it would ***always*** issue a margin call before liquidating Camelart's positions and would ***always*** permit Camelart a reasonable period to satisfy those calls, something StoneX was not required to do under the contract. *See* R. 26-1 at 17 § 18 (noting that StoneX's making a margin call on Camelart in one instance "shall not … be deemed to require any such tender, demand, call, or notice on any subsequent transaction"). Camelart has not cited to such an explicit promise but has instead attempted to construct one in the aggregate.

In any event, even assuming Camelart's new allegations satisfy Rule 9(b) and amount to an oral promise to always provide margin calls and reasonable time to satisfy them, the fact remains that its contract with StoneX expressly provided StoneX with the right "in its sole discretion, to liquidate all or any part of [Camelart's] positions through any means available, without prior notice" in the event Camelart's account was under-margined, notwithstanding anything in the contract to the contrary. R. 26-1 at 13 § 4. Unambiguous written provisions control over oral statements to the contrary and bar fraud claims premised on the latter. *See Carr v. CIGNA Secs., Inc.*, 95 F.3d 544, 547 (7th Cir. 1996) ("If a literate, competent adult is given a document that in readable and comprehensible prose says X (X might be, 'this is a risky investment'), and the person who hands it to him tells him, orally, not-X ('this is a safe investment'), our literate, competent adult cannot maintain an action for fraud against the issuer of the document."); *Assocs. in Adolescent Psychiatry, S.C.*

8

*v. Home Life Ins. Co.*, 941 F.2d 561, 571 (7th Cir. 1991) ("Documents that unambiguously cover a point control over remembered (or misremembered, or invented) oral statements."). The liquidation provisions in the parties' contract foreclose Camelart's reliance on purported oral representations to the contrary.

The FAC's allegations regarding StoneX's course of conduct are similarly unavailing. The crux of these allegations is that in previous instances where Camelart's account became under-margined or risked becoming under-margined, StoneX issued margin calls and allowed Camelart time to meet them. The Court has already found that the contract is unambiguous and clearly on point, rendering the parties' course of conduct irrelevant to its interpretation. *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984). Even if the Court were to consider StoneX's past practices as relevant to a theory of contract modification (which Camelart has not meaningfully advanced), the contract states that StoneX's making a margin call on Camelart in one instance did not require it to make a similar demand or call—let alone provide a "reasonable time" to meet such a call—before liquidating some or all of Camelart's positions in a later instance. R. 26-1 at 17 § 18. Camelart's acting in accordance with the contract cannot be said to have modified its terms. *See infra* § 3 (discussing Camelart's waiver argument). Margin calls in general were contemplated in the contract only "to the extent practicable," and the FAC emphasizes that March 2020 was an extremely volatile time in the oil market.

Furthermore, Camelart has not plausibly alleged scienter. Camelart argues that StoneX's representations about allowing time to meet margin calls were at least

9

reckless because it knew that it could and would liquidate Camelart's under-margined account anytime it wanted. "In determining whether the plaintiff has made an adequate allegation of scienter, 'the reviewing court must ask: When the allegations are taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *Lindstrom*, 2020 WL 7398792, at *4 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007)). Here, StoneX "had a motive to avoid a situation in which its customers could not satisfy a large margin call," since it would have been responsible for any deficiency. *Id.* The 7-hour time difference occasioned by Camelart's arrangement only increased this risk for StoneX—there is no rational reason why StoneX would have tried to trick Camelart into keeping it in place.

Finally, Camelart cannot show that any alleged misrepresentation caused its claimed damages. Causation in the context of a CEA fraud claim ordinarily means that the plaintiff "actually relied" on the alleged misrepresentation. *Indosuez Carr Futures, Inc. v. Commodity Futures Trading Comm'n*, 27 F.3d 1260, 1265 (7th Cir. 1994). However, "an investor who has information known by him to be accurate cannot rely instead upon an isolated oral variance contradicting the truthful information." *Id.* at 1265. The contract governing Camelart's trading account plainly permitted StoneX to liquidate Camelart's positions without notice, contrary to what Camelart claims was represented. In addition, Verevskyi, who began his trading career at age 19 and now holds a net worth over $1 billion, is a sophisticated commodities trader and undoubtedly recognized that quick responses to margin calls

10

were expected. Camelart's own complaint emphasizes that precise timing "makes all the difference between making a terrific profit and sustaining a terrific loss." R. 26 ¶ 13. That the 7-hour time difference between Camelart and StoneX might someday present a complication in meeting a margin call was obvious. *See Mut. Assignment & Indemnification Co. v. Lind-Waldock & Co.*, 364 F.3d 858, 860 (7th Cir. 2004) ("[A]nyone who chooses to trade in a market where wire transfers are the norm and immediate action the requirement must meet those standards or accept the consequences.").

Camelart again points to *Baghdady*, but that case remains distinguishable given that the alleged misrepresentations at issue were not, as they are here, clearly contradicted by a written contract. *See Baghdady v. Robbins Futures Inc.*, No. 97 C 8794, 1999 WL 162789, at *4-5 (N.D. Ill. March 12, 1999). The parties in *Baghdady* had layered additional dealings on top of the basic trading agreement (which is not discussed in meaningful detail), and the plaintiff alleged specific misrepresentations by the defendants that he could use a particular trading program. *Id.* at *1. The FAC also fails to plausibly allege bad faith, only claiming that StoneX liquidated Camelart's account when it was under-margined. This is standard risk-mitigation practice for futures commission merchants. *See Mohammed v. Jack Carl/312 Futures, Index Futures Grp., Inc.*, CFTC No. 91-R102, 1992 WL 15686, at *2 (Jan. 27, 1992) ("When an account becomes undermargined, the futures commission merchant is exposed to risk. It is not a violation of the [CEA] for a futures merchant to liquidate positions on an account to avoid such risk.").

Because Camelart has failed to plausibly allege multiple necessary elements for a fraud claim under the CEA, that claim is again dismissed.[2]

### III. Waiver Claim

The FAC adds an allegation that StoneX waived its right to rely on the liquidation provisions in the contract through its "conduct and statements to the effect that it would not liquidate Camelart's trading positions without permitting Camelart a reasonable period for Camelart to satisfy a margin call." The contract contains multiple no-waiver provisions, including limiting amendments to those in writing and a directive that "[f]ailure of [StoneX] to enforce any provision of this Agreement shall not be construed to be a waiver of such provision or affect the validity of this Agreement or the right of [StoneX] thereafter to enforce each provision hereof." R. 26 at 18 § 20. Camelart notes that no-waiver clauses, including waiver-only-in-writing provisions, may be waived by words and deeds. *Chicago Coll. of Osteopathic Medicine v. George A. Fuller Co.*, 776 F.2d 198, 202 (7th Cir. 1985). An implied waiver requires a "clear, unequivocal, and decisive act" by a party "manifesting an intention to waive its rights." *In re Nitz*, 739 N.E.2d 93, 103 (Ill. App. Ct. 2000).

As explained above, Camelart cannot show waiver here because StoneX's actions were not inconsistent with the contract. None of the allegations in the FAC amount to a promise by StoneX that it would always provide a margin call, and a reasonable time to satisfy that call, before liquidating Camelart's positions. Nor did

---

[2] The Court again need not reach the question of whether Camelart has plausibly alleged resulting damages.

StoneX's choice to permit Camelart a reasonable opportunity to meet prior margin calls obligate it to do so in every subsequent instance. *See* R. 26-1 at 17 § 18; *see also Capital Options Invs., Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 190 (7th Cir. 1992) (rejecting argument that futures commission merchant's departure from prior margin call practice was evidence of bad faith because the governing agreement "specified that a failure to call for margin did not waive their right to do so at any time in the future").

Camelart responds that it was not StoneX's choice to allow Camelart time to meet a specific margin call that effected the waiver, "but rather the whole of their conduct for nearly three years." This argument nonsensically suggests that StoneX steadily lost its discretionary right each time it exercised it. The only way for StoneX to "reset" its liquidation right would have been to liquidate Camelart's account at some previous point. This would render the discretionary grant in the Agreement meaningless and make the actual trading relationship functionally unworkable. It is also at odds with prevailing case law endorsing the rights of futures commission merchants to act in their own discretion in order to effectively manage the risk inherent in commodities futures trading. *See, e.g.*, *Capital Options*, 958 F.2d at 190 (observing that the "financial integrity and the efficiency of the market" requires futures commission merchants be able to exercise their discretion without the fear of subsequent claims of bad faith); *Prudential-Bache Sec., Inc. v. Stricklin*, 890 F.2d 704, 706-07 (4th Cir. 1989) (finding that no-notice liquidation provisions are "reasonable in the volatile and risky put options market").

In summary, Camelart has not pled facts sufficient to demonstrate that StoneX waived the liquidation provisions in the Agreement. Camelart's waiver count is therefore dismissed.

## IV. Estoppel Claim

Camelart's estoppel claim is akin to equitable estoppel, which is not an affirmative cause of action. *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 526 (Ill. 2009). Camelart's standalone estoppel claim must therefore be dismissed. To the extent Camelart pleads estoppel as an "affirmative counter-defense," *id.*, it likewise cannot succeed. To establish estoppel, a plaintiff is required to show:

> (1) voluntary words or conduct by the estopped party amounting to a misrepresentation or concealment of material facts; (2) actual or implied knowledge of the estopped party that the representations were not true; (3) lack of knowledge of the true facts by the innocent party both at time made or at time acted upon; (4) intent, or a reasonable expectation, on the part of the estopped party that the innocent party would act on the misrepresentations; (5) a reasonable, good-faith, detrimental change of position by the innocent party based on the misrepresentations; and (6) prejudice to the innocent party.

*Hubble v. O'Connor*, 684 N.E.2d 816, 825 (Ill. App. Ct. 1997).

Camelart's estoppel claim rests on the same allegations of misrepresentation as his other claims and fails for the same reasons. Camelart has not plausibly alleged a material misrepresentation, and its reliance on the purported promise that it would always be given time to meet margin calls is not reasonable given the provisions in the contract permitting no-notice liquidation. *See In re Krueger*, 192 F.3d 733, 741 (7th Cir. 1999) ("It is established that a party claiming the benefit of an estoppel cannot shut his eyes to obvious facts, or neglect to seek information that is easily

14

accessible, and then charge his ignorance to others." (cleaned up)). StoneX is not estopped from relying on the liquidation provisions in the Agreement.

## V. Promissory Estoppel Claim

Unlike equitable estoppel, promissory estoppel may be used as a cause of action to recover damages. *Newton Tractor Sales*, 906 N.E.2d at 526. However, the existence of an enforceable contract between the parties "concern[ing] the same subject matter" bars recovery on a promissory estoppel theory. *Song v. PIL, L.L.C.*, 640 F. Supp. 2d 1011, 1016 (N.D. Ill. 2009). Seeking to avoid this rule, Camelart argues that the alleged promise is outside the scope of the contract because it "involves assurances that go beyond the Agreement" and because the contract did not address the parties' seven-hour time difference. R. 31 at 10. This argument construes the rule too narrowly—the contract dictated the relationship between the parties and the rules that would control margin calls and possible liquidation of Camelart's account. Minutiae not specifically addressed in a contract are not automatically outside the contract's scope for these purposes. *See Barwin v. Village of Oak Park*, No. 14 C 6046, 2015 WL 1399053, at *4 (N.D. Ill. Mar. 25, 2015) (holding that enforceable employment contract barred promissory estoppel claim regarding purchase out-of-state pension credits even though it was not addressed by the contract). Camelart's promissory estoppel claim merely revives its allegations that StoneX breached its obligations under the contract and cannot proceed as such.

Even if Camelart's allegations were outside the scope of the contract, Camelart's allegation that StoneX made an "unambiguous promise" to allow

15

Camelart time to meet margin calls before liquidating its account is conclusory and unsupported by specific facts. *Newtown Tractor Sales*, 906 N.E.2d at 523. Furthermore, as explained above, Camelart's reliance on such a promise would have been plainly unreasonable. *See N. Trust Co. v. VIII S. Mich. Assocs.*, 657 N.E.2d 1095, 1103 (Ill. App. Ct. 1995) ("A party cannot close his eyes to the contents of a document and then claim that the other party committed fraud merely because it followed this contract."). Accordingly, Camelart's promissory estoppel claim is dismissed.

## Conclusion

For the foregoing reasons, StoneX's motion to dismiss the First Amended Complaint [27] is granted. There appearing no set of facts that Camelart can plead to establish a plausible claim for relief and having already afforded Camelart with an opportunity to amend, Counts I-V of the First Amended Complaint are dismissed with prejudice.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: October 19, 2021